Michael L. Braunstein, Esq.
**THE BRAUNSTEIN LAW FIRM, PLLC**
3 Eberling Drive
New City, New York 10956
Telephone:     (845) 642-5062
E-mail: mbraunstein@braunsteinfirm.com

David C. Silver, Esq. (*pro hac vice forthcoming*)
Jason S. Miller, Esq. (*pro hac vice forthcoming*)
**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:     (954) 516-6000
E-mail: DSilver@SilverMillerLaw.com
E-mail: JMiller@SilverMillerLaw.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN SILVERMAN, an individual,<br><br>     Plaintiff,<br><br>v.<br><br>PAYWARD, INC., a Delaware corporation;<br>PAYWARD VENTURES, INC., a Delaware<br>corporation; and INFINITUDE, LTD., a<br>Delaware corporation;<br><br>     Defendants. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES**<br><br>Civil Action<br><br>JURY TRIAL DEMANDED |

Plaintiff JONATHAN SILVERMAN, an individual (hereafter referred to as "Plaintiff"),

by and through undersigned counsel, hereby sues Defendant PAYWARD, INC., a Delaware

corporation); PAYWARD VENTURES, INC., a Delaware corporation; and INFINITUDE, LTD.,

a Delaware corporation (hereinafter collectively referred to as "Defendants" or "KRAKEN")[1]; for monetary damages.  As grounds therefor, Plaintiff alleges the following:

## NATURE OF THE ACTION

1.      This action arises from an employment agreement between Plaintiff and KRAKEN that KRAKEN has unjustifiably breached.

2.      Moreover, even after the parties had forged an agreement resolving the damages caused by KRAKEN's breach of the employment agreement, KRAKEN failed to fulfill its obligations under the settlement.

3.      Therefore, this is an action to enforce the terms of the parties' settlement agreement; or, in the alternative, to enforce the terms of Plaintiff's employment contract and properly compensate him for the services he provided to KRAKEN as well as the services he would have provided to KRAKEN had his employment not been prematurely and unjustly terminated.

4.      As a result of KRAKEN's contractual breaches, Plaintiff has suffered economic harm for which he seeks compensatory relief.

---

[1] Upon information and belief, PAYWARD, PAYWARD VENTURES, and INFINITUDE all collectively operate under the shared tradename "KRAKEN."  This information was obtained from KRAKEN's publicly-available Privacy Policy (http://www.kraken.com/legal/privacy), which states: *"Payward," "Kraken," "We," and "Us" refers to Payward, Inc. and its wholly owned subsidiaries (also referred to collectively as "Payward," "Kraken," "we," or "us").*  Using Defendants' own terminology, those corporate entities will, at times herein, be interchangeably referred to as "KRAKEN."

## PARTIES, JURISDICTION, AND VENUE

### THE PARTIES

5.      Plaintiff JONATHAN SILVERMAN is an individual domiciled in Brooklyn, New York and is *sui juris*.

6.      Defendant PAYWARD, INC. ("PAYWARD") is a Delaware corporation with its principal place of business in San Francisco, California.  At all times material hereto, PAYWARD operated an office in the City, County, and State of New York.  Prior to October 1, 2017, PAYWARD's New York office was located at 205 East 42nd Street, New York, NY.  Thereafter, PAYWARD's New York office was located at 1201 Broadway - Suite 912, New York, New York.

7.      Defendant PAYWARD VENTURES, INC. ("PAYWARD VENTURES") is a Delaware corporation with its principal place of business in San Francisco, California.  Upon information and belief, PAYWARD VENTURES is a wholly-owned subsidiary of PAYWARD.

8.      Defendant INFINITUDE, LTD. ("INFINITUDE") is a Delaware corporation with its principal place of business in New York, New York.  Upon information and belief, INFINITUDE is a wholly-owned subsidiary of PAYWARD.  Upon further information and belief, INFINITUDE was created in 2017 to hold the lease as the tenant for the office space at 1201 Broadway, New York, NY at which Plaintiff worked for PAYWARD.

9.      PAYWARD, as the one-hundred percent (100%) owner of PAYWARD VENTURES and INFINITUDE, is essentially the alter ego of those subsidiaries, which commonly operate with PAYWARD under the shared tradename "KRAKEN."  Upon information and belief, the entities are all dominated by the same individuals, use the same corporate decision-makers, the same resources, and the same business connections.  Thus, they are essentially one-and-the-same business, regardless of the particular name under which each company's operations are conducted.

10.     In addition to KRAKEN, there are likely other parties who may be liable to Plaintiff, but about whom Plaintiff currently lacks specific facts to permit him to name these persons or entities as party defendants.  By not naming such persons or entities at this time, Plaintiff is not waiving his right to amend this pleading to add such parties, should the facts warrant adding such parties.

### JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest, costs and attorneys' fees, and is an action between citizens of different states.

12.     This Court has personal jurisdiction over KRAKEN because KRAKEN: (a) operates, conducts, engages in and/or does business within this jurisdiction; and/or (b) committed contractual or tortious breaches in this jurisdiction.

13.     Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1391 because the causes of action accrued in this jurisdiction.

### FACTS APPLICABLE TO ALL CAUSES OF ACTION

### Kraken's Business

14.     KRAKEN promotes itself as "*one of the largest and oldest Bitcoin exchanges in the world*" and "*one of the best places to buy and sell crypto online*."[2]  KRAKEN further represents that since the company was founded, "*the company has grown by leaps and bounds with hundreds of employees spanning the globe.*"[3]

---

[2] https://www.kraken.com/en-us/why-kraken.

[3] *Id.*

15.     Along with servicing many individual accountholders who engage in cryptocurrency and fiat currency trades through their KRAKEN accounts, KRAKEN has also operated an institutional trading business from its San Francisco headquarters and from multiple locations in Southeast Asia.

### Plaintiff's Employment with Kraken

16.     In or about April 2017, KRAKEN hired Plaintiff to head KRAKEN's Institutional Sales and Trading Business and relocate the business to New York.  Attached hereto as **Exhibit "A"** is a March 30, 2017 letter from KRAKEN to Plaintiff "confirm[ing] [his] new position of Managing Director, Sales and Trading, with the Company."

17.     Under his employment arrangement with KRAKEN, Plaintiff was to work at KRAKEN's Institutional Sales and Trading Desk (the "Trading Desk"), and his compensation would include the following:

> (a) a base salary of One Hundred Fifty Thousand Dollars ($150,000.00), and

> (b) participation in a stock option plan.

18.     Additionally, Plaintiff and KRAKEN's Chief Executive Officer (Jesse Powell) directly negotiated with one another and orally agreed that Plaintiff's compensation would include a commission of ten percent (10%) of the Trading Desk's annual profit, to be calculated and paid in December of each year.

19.     The above-cited terms constitute Plaintiff's "Employment Agreement" with KRAKEN.

20.     Plaintiff negotiated directly with Mr. Powell to formulate the terms of the Employment Agreement.

21.     Specifically, Mr. Powell orally represented to, and assured, Plaintiff in or about early-April 2017 that Plaintiff's compensation would include the ten percent (10%) commission of the Trading Desk's profits.

22.     The profit of the Trading Desk was to be calculated for any period of time as the difference between: (a) the ending value for that period minus the initial capital of the Trading Desk, and (b) the beginning value for that period minus the initial capital and minus the expenses incurred by the Trading Desk over that period (the "Trading Desk Profit").

23.     Moreover, the commission due and owing to Plaintiff from the Trading Desk Profit was due to be paid to him in or about December 2017 -- less than one year after his Employment Agreement with KRAKEN had commenced.

24.     From April 2017 to December 2017, Plaintiff duly performed all obligations required of him under his employment with KRAKEN, including managing KRAKEN's Trading Desk.

25.     Plaintiff's predecessor at KRAKEN (Kevin Zhou) created a KRAKEN trading account -- labeled by Mr. Zhou as the "Propeller" account -- that Plaintiff used to engage in Trading Desk transactions for the company.

26.     For some trades, the Trading Desk could facilitate the trades on its own, with KRAKEN CFO Kaiser Ng's team handling the wire transfers needed.

27.     However, to settle an over-the-counter (OTC) trade against a user's KRAKEN account, Plaintiff would send an electronic mail message to KRAKEN's Chief Technology Officer (Thanh Luu), who would then make the necessary credits and debits to effectuate an internal transfer of KRAKEN's assets needed to fulfill the trade order.

28.     Additional employees were also actively involved in the Trading Desk's activities. For example, for the first few months of his employment with KRAKEN, a lower-ranking

employee in Plaintiff's workgroup (Robert Frost) was responsible for handling back-office management and recordkeeping for the OTC trades in which the Trading Desk engaged.

29.     Moreover, throughout his employment with KRAKEN, Plaintiff attended frequent meetings -- oftentimes on a weekly basis -- at which he was able to discuss at length with KRAKEN's senior management team (*e.g.*, CEO Jesse Powell, In-House Counsel Pamela Merkadeau, CFO Kaiser Ng) Trading Desk activities, profitability, and investment strategies.

30.     During his employment with KRAKEN, Plaintiff traded exclusively for the benefit of the company -- primarily through the Propeller account, though other accounts to benefit the company were created over time.

31.     Based upon publicly-available information, the Trading Desk is believed to have made for KRAKEN during the time period relevant to this dispute a Trading Desk Profit (before expenses) of approximately Nineteen Million Dollars ($19,000,000.00).[4]

**Kraken's Breach of Settlement Agreement between the Parties**

32.     At no time during his employment with KRAKEN was Plaintiff given a negative performance review.

33.     In December 2017, however, Plaintiff's employment with KRAKEN was involuntarily terminated.

34.     Upon information and belief, KRAKEN terminated Plaintiff because, *inter alia*, KRAKEN had been misrepresenting to the public and government regulators that it was not operating in New York; when in reality, KRAKEN's OTC practice, and OTC trading (including

---

[4] This information was obtained from a lawsuit styled *Robert C. Adler v. Payward, Inc. d/b/a Kraken*, U.S. District Court - Southern District of New York - Case No. 1:18-cv-08100-PAC (the "Adler Lawsuit").  As of the date of this filing, the factual allegations asserted in the Complaint in the Adler Lawsuit have not been refuted or disproven.

logging into the KRAKEN exchange and negotiating wire transfers) occurred almost exclusively in New York; and INFINITUDE's principal (if not sole) place of business operation was in New York, whether labeling itself as INFINITUDE or KRAKEN.  KRAKEN Chief Executive Officer Jesse Powell's public statements that "Kraken left New York because New York is hostile to crypto" were misleading at best.

35.     Moreover, despite participation in KRAKEN's stock option plan being part of his compensation, Plaintiff never received from KRAKEN a copy of the company's stock option plan or the options owed to him.

36.     From December 2017 through and including July 2018, Plaintiff and KRAKEN engaged in extensive discussions about how KRAKEN would compensate Plaintiff for his involuntary separation from the company.

37.     In the course of their discussions, KRAKEN Chief Executive Officer Jesse Powell stated to Plaintiff:

(a) KRAKEN would pay Plaintiff Nine Hundred Seven Thousand Six Hundred Thirty-One Dollars ($907,631.00) as a lump sum settlement of the dispute between them over Plaintiff's forced separation from the company;

(b) "Please treat the $907,631 as a settlement amount, not a bonus payout, that we are offering you.  We look forward to hearing from you on the acceptance of our settlement offer."; and

(c) "We have dedicated a significant amount of time arriving at this number and it is honestly, in my belief, what you would have received had you still been at the company today, with everything in order."

38.     In July 2018, Plaintiff accepted KRAKEN's offer of Nine Hundred Seven Thousand Six Hundred Thirty-One Dollars ($907,631.00) (the "Settlement Agreement") and notified KRAKEN of same.

39.     KRAKEN's In-House Counsel Pamela Merkadeau confirmed the agreement in subsequent conversations with Plaintiff's counsel.

40.     Notwithstanding Plaintiff's acceptance of the terms of KRAKEN's offer, KRAKEN thereafter refused to provide Plaintiff the agreed-upon payment.

41.     Plaintiff duly performed all of his duties and obligations, and any conditions precedent to Plaintiff bringing this action have occurred, have been performed, or else have been excused or waived.

42.     To enforce his rights, Plaintiff has retained undersigned counsel and is obligated to pay counsel a reasonable fee for its services.

## COUNT I – BREACH OF CONTRACT
### (Settlement Agreement)

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 42 above, and further alleges:

43.     The Settlement Agreement constitutes a contract between Plaintiff and KRAKEN.

44.     KRAKEN has breached the express terms the Settlement Agreement by, *inter alia*, failing to pay Plaintiff the sum due thereunder.

45.     As a direct and proximate result of KRAKEN's breach of the Settlement Agreement, Plaintiff has suffered damages in the principal sum of Nine Hundred Seven Thousand Six Hundred Thirty-One Dollars ($907,631.00).

## COUNT II – BREACH OF CONTRACT
### (Employment Agreement)

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 42 above, and further alleges:

46.     The Employment Agreement constitutes a contract between Plaintiff and KRAKEN.

47. KRAKEN has breached the express terms the Settlement Agreement by, *inter alia*, failing to pay Plaintiff the commission payments due thereunder.

48. As a direct and proximate result of KRAKEN's breach of the Settlement Agreement, Plaintiff has suffered damages in a sum to be proven at trial.

## COUNT III – QUANTUM MERUIT

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 42 above, and further alleges:

49. At the request of KRAKEN, and during his employment with KRAKEN, Plaintiff provided KRAKEN with his professional services in good faith.

50. KRAKEN freely accepted and retained Plaintiff's services.

51. Plaintiff reasonably expected to receive a fair measure of compensation from KRAKEN for those services.

52. The reasonable value of those services far exceeds the limited compensation Plaintiff received from KRAKEN.

53. Although Plaintiff has demanded payment from KRAKEN, KRAKEN has failed and refused to pay Plaintiff.

54. As a direct and proximate result of KRAKEN's acts and omissions, Plaintiff has suffered damages in a sum to be proven at trial.

## COUNT IV – UNJUST ENRICHMENT

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 42 above, and further alleges:

55. At the request of KRAKEN, and during his employment with KRAKEN, Plaintiff provided KRAKEN with his professional services in good faith.

56. KRAKEN freely accepted and retained Plaintiff's services.

57.     KRAKEN has reaped the benefits of Plaintiff's professional services.

58.     For example, upon information and belief, the Trading Desk -- under Plaintiff's management -- made for KRAKEN during the time period relevant to this dispute a Trading Desk Profit (before expenses) of approximately Nineteen Million Dollars ($19,000,000.00).

59.     It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for KRAKEN to retain the substantial monetary benefits it has received from Plaintiff's services without fairly compensating Plaintiff.

60.     To remedy KRAKEN's unjust enrichment, the Court should order KRAKEN to fairly compensate Plaintiff for the windfall of profits Plaintiff produced for KRAKEN through the Trading Desk.

61.     As a direct and proximate result of KRAKEN's acts and omissions, Plaintiff has suffered damages in a sum to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff JONATHAN SILVERMAN, an individual, prays for entry of an award providing relief as follows:

(a) Entry of an award of monetary, punitive and actual damages and/or restitution, as appropriate;

(b) Prejudgment and post-judgment interest to the extent allowed by the law;

(c) Awarding all costs, expenses, experts' fees, and attorneys' fees incurred in prosecuting this action; and

(d) Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

## <u>RESERVATION OF RIGHTS</u>

Plaintiff reserves his right to further amend this Complaint, upon completion of his investigation and discovery, to assert any additional claims for relief against KRAKEN or other parties as may be warranted under the circumstances and as allowed by law.

Respectfully submitted,

**THE BRAUNSTEIN LAW FIRM, PLLC**

By:   */s/ MICHAEL L. BRAUNSTEIN*
       Michael L. Braunstein, Esq.
       3 Eberling Drive
       New City, New York 10956
       Telephone:  (845) 642-5062
       E-mail: mbraunstein@braunsteinfirm.com

- and -

**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:     (954) 516-6000
DAVID C. SILVER (*pro hac vice forthcoming*)
E-mail: DSilver@SilverMillerLaw.com
JASON S. MILLER (*pro hac vice forthcoming*)
E-mail: JMiller@SilverMillerLaw.com

*Counsel for Plaintiff, Jonathan Silverman*

Dated:   April 4, 2019